**UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,**

**v.**

**Robert R. KRILICH, Defendant–Appellant, Cross–Appellee.**

Nos. 97–2721, 97–2977.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1998.

Decided Oct. 27, 1998.

Joel D. Bertocchi (argued), Stephen Heinze, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Thomas D. Decker, Decker & Associates, Dennis A. Berkson, Lawrence C. Marshall (argued), Northwestern University Legal Clinic, Marc W. Martin, Chicago, IL, Herbert J. Miller, Jr., Nathan Lewin (argued), Stephen L. Braga, Paul F. Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, DC, for Robert R. Krilich.

Jeffrey Urdangen, Chicago, IL, for Amicus Curiae Illinois Attorneys for Criminal Justice.

Carol A. Brook, Office of the Federal Defender Program, Chicago, IL, for Amicus Curiae Federal Defenders of the Northern, Central and Southern Districts of Illinois.

Before EASTERBROOK, RIPPLE, and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

A golfer's dream came true for Andy Sarallo. On June 19, 1985, Andy lined up at the ninth tee at Country Lakes Country Club and struck the ball; an observer on the ninth green pulled Andy's ball out of the hole. Andy's foursome jumped up and down and shouted for joy. Because the ninth hole at Country Lakes was the subject of a hole-in-one contest that day, Andy had just won his choice of a 1931 Cadillac or a check for $40,000!

A hole-in-one is quite a thrill because it happens so infrequently—perhaps one chance in 40,000, rarer than a 300 game in bowling. But Andy's chances were close to 100%, because his father was mayor of Oakbrook Terrace, Illinois, and the mayor's support was needed for a bond offering to finance an apartment complex to be built by Robert Krilich—who sponsored the contest, pulled the ball out of the hole, and became the defendant in this criminal case. Krilich and Mayor Sarallo agreed to use the golf tournament as the vehicle for a payoff. Krilich palmed one of Andy's golf balls, put his hand into the cup, and displayed the ball. Delivering the bribe in this way enabled Krilich to shift the cost to the National Hole–In–One Association, which provided insurance. Thus fraud and bribery were coupled. Krilich admitted this scheme in a proffer to the United States Attorney, and he also conceded bribing the mayor to alter the zoning of some land and orchestrating the extraction of funds from municipal bond offerings. The bonds—Industrial Revenue Bonds, interest on which is not taxable to the investors— were sold to finance Krilich's developments. Because the bonds were limited to specific projects (tax exemption depended on that

link), the funds were placed in trust, and the trustee banks were to release the money only to reimburse expenses associated with the projects. Preferring to use the money elsewhere, such as for payments on his yacht, Krilich instructed vendors to falsify their invoices and had those bogus invoices sent to the banks for payment out of the trust accounts.

Krilich was convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C § 1962(d) (RICO), and a fraud statute, 18 U.S.C. § 1014. Krilich maintains on appeal that the district court erred by permitting the prosecutor to use some of the proffer's contents at his trial, that 18 U.S.C. § 1014 does not apply to his conduct, that the instructions improperly removed some issues from the jury's consideration, and that he is not criminally liable for other reasons. The United States argues in a cross-appeal that Krilich's 64–month prison sentence is too low.

**I**

Statements made during plea negotiations are inadmissible, Fed.R.Evid. 410; Fed.R.Crim.P. 11(e)(6), but a defendant may waive the right to prevent their use. *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). The agreement Krilich signed contains a conditional waiver:

> [S]hould [Krilich] subsequently testify contrary to the substance of the proffer or otherwise present a position inconsistent with the proffer, nothing shall prevent the government from using the substance of the proffer at sentencing for any purpose, at trial for impeachment or in rebuttal testimony, or in a prosecution for perjury.

By authorizing the prosecutor to use his statements if he should contradict himself, Krilich made his representations more credible and thus strengthened his hand in negotiations. See *Mezzanatto*, 513 U.S. at 207, 115 S.Ct. 797; Eric Rasmusen, *Mezzanatto and the Economics of Self–Incrimination*, 19 Cardozo L. Rev. 1541 (1998). A prosecutor may be reluctant to negotiate; what has the defendant to offer? A statement that shows how the defendant's aid could assist the prosecutor in other cases (or lead to the appropri-

ate sentence in this one) may get negotiations under way and set the stage for a favorable bargain. But a prosecutor needs assurance that the defendant is being candid. A conditional waiver of the kind Krilich signed tends to keep the defendant honest, which makes the proffer device more useful to the both sides. For this strategy to work the conditional waiver must be enforceable; its effect depends on making deceit *costly*. We therefore reject the argument that waivers should be construed against prosecutors; that might help Krilich today but would hinder bargaining for other defendants tomorrow. We give this waiver neither a stingy reading nor a generous one, but a natural reading, which leaves the parties in control through their choice of language.

■ This agreement allowed the prosecutor to use the proffer as evidence if Krilich were to "testify contrary to the substance of the proffer or otherwise present a position inconsistent with the proffer". Introduction of the statements thus was proper if either his testimony, see *United States v. Goodapple*, 958 F.2d 1402, 1409 (7th Cir.1992), or evidence that he presented through the testimony of others, see *United States v. Richardson*, 130 F.3d 765, 778 (7th Cir.1997); *United States v. Dortch*, 5 F.3d 1056, 1068 (7th Cir.1993), contradicted the proffer. Because Krilich did not testify, only the second clause is at issue. Krilich wants us to limit this clause to evidence presented through his own witnesses; evidence obtained by cross-examination of the prosecution's witnesses does not count, he insists. But that would be an unnatural reading of the language. Evidence is evidence, whether it comes out on direct or cross-examination. One can "otherwise present" a position through arguments of counsel alone, so it is easy to see how a position can be "presented" by evidence developed on cross-examination and elaborated by counsel. When the prosecution's witnesses are inclined to accommodate the defense, as many were in this case, developing one's position through cross-examination is especially attractive.

The prosecutor's position about the effect of the language is as unrealistic as ·Krilich's. According to the prosecutor, putting on *any*

defense permits the United States to introduce the statements. A plea of not guilty followed by passivity at trial is about all the defense can do, the prosecutor contends—though, when pressed at oral argument, the prosecutor allowed that Krilich could have avoided introduction of the statements if he had limited his cross-examination to "the credibility, weight and sufficiency of the government's evidence in ways that were extrinsic to the facts of the case". On this understanding, asking a witness on cross-examination whether he had been convicted of perjury would be "extrinsic to the facts of the case", but asking the witness whether he had been in a position to see what happened at the ninth green on June 19 would open the door to the use of the proffer. Such a distinction makes sense of neither the language in the contract nor the reason why the waiver was *conditional*. The prosecutor wanted to give Krilich an incentive to tell the truth; Krilich wanted assurance that he could defend himself at trial if bargaining collapsed (for otherwise he was delivering himself into the prosecutor's hands); conditioning the use of the proffer statements on the presentation of a position "inconsistent with the proffer" does both of those things only if the judge must find genuine inconsistency before allowing use of the statements.

■ Impeachment of a witness need not be "contrary to" or "inconsistent with" a defendant's admission of guilt in a bargaining proffer. To take a simple example, the statements "I faked the hole-in-one on the ninth hole" (Krilich, in the proffer) and "I did not see Krilich palm a golf ball at the ninth hole on June 19" (a witness, on cross-examination) are not inconsistent. Investigation via cross-examination of witnesses' ability (or willingness) to observe and recount the facts they claim to have observed therefore could not have justified introduction of the proffer statements. Millions of people who live in Illinois did not see what happened at the ninth green on June 19; others who did see what happened may have had reasons to misrepresent what they saw; proof that a given person who took the stand at trial was in the set of non-observers (or liars) is not "inconsistent" with the proffer. Statements are inconsistent only if the truth of one im-

**1026**

plies the falsity of the other. The statements "Krilich pulled a palmed ball from the cup at the ninth hole" and "Krilich wasn't at the ninth hole when Andy hit his shot" are inconsistent because the former statement cannot be true if the latter is. This appeal turns on whether Krilich elicited such inconsistent testimony. The district judge concluded that he had, and that assessment is not clearly erroneous.

■ Several witnesses testified, in response to questions from Krilich's attorney, that the ninth hole at Country Lakes Country Club is close to the clubhouse and easily observed. Krilich wanted the jury to infer that no one would attempt to fake a hole-in-one there; that implication is inconsistent with the proffer. Defense counsel got two witnesses to say that they were at the ninth hole when Andy hit the shot but didn't think that Krilich was at the ninth hole then. This line of cross-examination was not designed to cast doubt on the witnesses' ability to see clearly or suggest that they are not trustworthy. Their testimony implied that Krilich did not fake the hole-in-one, contrary to what he admitted in his proffer. Similarly, in response to evidence that Krilich paid a bribe to obtain favorable zoning, his lawyer elicited testimony on cross-examination that no bribe was required because the city attorney thought the new zoning to be correct. Counsel likewise led witnesses to testify that the procedures followed for altering the zoning were not exceptional. Krilich's attorney also had the vice president of his company testify that he was not aware of *any* bribes paid to *any* public official in connection with *any* project. The implication was that if someone so close to Krilich (and the projects) was unaware of bribes, there must not have been any. These statements go well beyond casting doubt on the prosecutor's evidence; they advance a position inconsistent with the proffer—or so the trial judge sensibly could conclude.

■■ Krilich insists that if the conditional waiver means what we think it means, then it is unenforceable because involuntary. *Mezzanatto* says that waivers of the plea-statement rules are unenforceable if given "unknowingly or involuntarily" (513 U.S. at 210,

115 S.Ct. 797), but this is a far cry from saying that waivers mean whatever the defendants say they understood them to mean; no party to a contract has Humpty Dumpty's power over language either directly or through the gambit that unanticipated consequences render the agreement "involuntary." A waiver is voluntary in the absence of coercion, *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir.1997), and is knowing if made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Krilich does not contend that his assent was coerced and offers no support for a conclusion that he didn't understand the rights that Rules 410 and 11(e)(6) confer. A defendant's understanding of the *consequences* of his waiver need not be perfect; it was Krilich's understanding of the rights being relinquished, not of all possible repercussions of relinquishing them, that made his waiver knowing. See *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

## II

■ One of the racketeering acts supporting Krilich's RICO conviction is a bribe of Nicholae Ionescu, Zoning Administrator and City Engineer of Oakbrook Terrace. Facing troubles with federal environmental authorities, Krilich asked Ionescu to supply an affidavit stating that development should be allowed to continue. Ionescu signed the affidavit and that afternoon met with Krilich at a restaurant, where without saying a word Krilich passed Ionescu an envelope containing $300. Krilich contends that a "gratuitous after-the-fact payment" is insufficient to prove bribery in Illinois, whose law controls on this question.

■ Illinois does not treat payment before-the-fact as an element of bribery. See, e.g., *People v. Wright*, 105 Ill.App.3d 187, 61 Ill.Dec. 89, 434 N.E.2d 26 (2d Dist.1982). A corporation that pays employees at the end of the workweek instead of at the beginning

does not give gifts every Friday. Thus Krilich must be arguing that, because the payment was gratuitous, it could not be a bribe. That's a tautology, but *whether* a payment was "gratuitous" is a question of fact, rightly left to the jury. Krilich believes that the prosecutor adduced insufficient evidence of illicit intent behind the payment. But a reasonable jury could infer that this was a bribe—indeed, that Ionescu was on Krilich's payroll, so often had he been bribed before. The lack of *any* comment during the payoff is strong evidence that this payment was expected (for Ionescu's part) and offered as compensation for the affidavit (for Krilich's).

### III

■ The indictment charges that Sarallo solicited the hole-in-one bribe in April 1985. At trial, however, the prosecution elicited testimony from Terry Pearson, Krilich's bagman, that the bribe was solicited in the months preceding April 1984. Everyone agrees that the hole-in-one bribe was in exchange for Sarallo's support in an April 1984 vote regarding the Oakbrook Terrace bond issue, so the date in the indictment is a blunder. Citing *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), Krilich argues that the prosecutor, by arguing the new date at trial, constructively amended the indictment in violation of the grand jury clause of the fifth amendment. But charging that an act occurred on one date and proving that it occurred at a different time is a classic variance, which does not change the nature of the crime alleged. *United States v. Nicosia*, 638 F.2d 970, 976 (7th Cir.1980). Compare *Stirone* with *United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). Cases such as *United States v. Willoughby*, 27 F.3d 263, 265–66 (7th Cir.1994), like *Stirone* itself, involved the substitution of one criminal offense for another; a change of dates does not (the date of a crime is not an element of the offense). Krilich has not argued that the difference between the allegations and the proof prejudiced his ability to defend himself; variance here was harmless. *United States v. Cina*, 699 F.2d 853, 858–59 (7th Cir.1983).

### IV

■ Krilich was convicted of fourteen counts of violating 18 U.S.C. § 1014:

**Loan and credit applications generally; renewals and discounts; crop insurance**

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the Farm Credit Administration, Federal Crop Insurance Corporation or a company the Corporation reinsures, the Secretary of Agriculture acting through the Farmers Home Administration, the Rural Development Administration, any Farm Credit Bank, production credit association, agricultural credit association, bank for cooperatives, or any division, officer, or employee thereof, or of any regional agricultural credit corporation established pursuant to law, or a Federal land bank, a Federal land bank association, a Federal Reserve bank, a small business investment company, a Federal credit union, an insured State-chartered credit union, any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, any Federal home loan bank, the Federal Housing Finance Board, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Farm Credit System Insurance Corporation, or the National Credit Union Administration Board, a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978 [12 U.S.C. § 3101(1) and (3) ] ), or an organization operating under section 25 or section 25(a) of the Federal Reserve Act, upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. The term "State-chartered credit union" includes a credit union chartered under the

laws of a State of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States.

Krilich's agents made the false statements so that he could tap bond proceeds held in trust by banks. He argues that this provision applies only to statements made to obtain loans or other extensions of credit; because the withdrawals of the trust funds were not lending transactions, the statute was not violated, he submits. *United States v. Devoll*, 39 F.3d 575, 579–80 (5th Cir.1994), supports this contention, but this court and at least two more have applied § 1014 to transactions other than loans. *United States v. Tucker*, 773 F.2d 136, 139 (7th Cir.1985); *United States v. Yung Soo Yoo*, 833 F.2d 488 (3d Cir.1987); *United States v. Bonnette*, 781 F.2d 357, 366 (4th Cir.1986). *Tucker* affirmed a conviction of a con artist who forged shipping documents that led a bank to permit a draw against a letter of credit; so far as the opinion reveals, the letter of credit was fully funded and the only loser was the would-be purchaser. See also *United States v. Erskine*, 588 F.2d 721, 722 (9th Cir.1978) (Kennedy, J.) (§ 1014 applies to "a loan or one of the other transactions listed in the statute"). Krilich ignores this adverse precedent but apparently wants us to overrule *Tucker* in order to follow *Devoll.*

▮ Krilich faces an uphill battle. The text of the statute is straightforward and broad: it applies to "any" statement made for the purpose of influencing in "any" way the action of "any" of the covered institutions in "any" application. Krilich caused vendors to make false statements in applications presented to federally insured banks. To overcome § 1014's breadth Krilich relies on the title of the section, specifically the phrase "[l]oan and credit applications generally". The title, according to Krilich, informs the reader that the statute applies only to applications for loans or credit, and not to applications for funds held in trust. Yet if the title limits the statute's breadth, then Krilich might as well argue that because his statements were not made in connection with "crop insurance" the statute does not apply to them. Although a statute's title can inform the understanding of ambiguous text, it

does not "limit the plain meaning of the text". *Pennsylvania Department of Corrections v. Yeskey*, —— U.S. ——, ——, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) (quoting from *Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947)). This text is not ambiguous, and only last year the Supreme Court reminded us not to add elements to § 1014. See *United States v. Wells*, 519 U.S. 482, 117 S.Ct. 921, 927, 137 L.Ed.2d 107 (1997) (materiality is not mentioned in § 1014, a "natural reading" of § 1014 would not make it an element, and therefore the prosecutor need not establish that the false statement is material to the financial institution's decision).

The drumbeat of "any" in § 1014 is not the only reason to conclude that it applies to transactions other than loans (and crop insurance). It deals with misstatements to "a Federal Reserve bank, ... the Office of Thrift Supervision, ... the Federal Housing Finance Board, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Farm Credit System Insurance Corporation, [and] the National Credit Union Administration Board", among others. None of these institutions makes loans (or underwrites crop insurance); and although one could quibble with this assessment by saying that the discount activities of the Federal Reserve and some of the operations of the FDIC (or RTC) as receiver of failed financial institutions involve loans, the Office of Thrift Supervision and other listed bodies are just regulators. If their inclusion in the statute is to have meaning, then § 1014 *must* cover statements that are not designed to influence an extension of credit—indeed, must cover statements that have nothing to do with the payment of money. Krilich's statements, like those in *Tucker*, were designed to induce a financial institution to disburse money, so they are within the reach of § 1014. Tiebreakers and doubt resolvers such as the Rule of Lenity therefore do not help Krilich; his problem is not that the statute is ambiguous, but that it is comprehensive. Legislative history likewise is of no assistance, given the Supreme Court's view that legislative history may not be employed to limit the

effect of a broadly worded statute. *Brogan v. United States*, 522 U.S. 398, —– – —–, 118 S.Ct. 805, 810–11, 139 L.Ed.2d 830 (1998).

*Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), on which Krilich relies so heavily, does not support his thesis. *Williams* posed the question whether a no-funds check is a "false statement" for the purposes of § 1014; the Court concluded that the only "statement" made by a check is an instruction to the drawee bank to pay, and that the implication that funds are available for that purpose is not covered by § 1014 because a misleading implication differs from a false statement. Cf. *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). Krilich can find no comfort in this conclusion; he induced vendors to make literally false statements. Only by departing from the holding of *Wells* that courts must not restrict the scope of § 1014 could we accept Krilich's understanding of the statute.

■■■ This does not conclude the appeal on the § 1014 counts, because the district judge instructed the jury that the falsified invoices and requisitions "were 'applications' within the meaning of this statute and that the funds withdrawn from the trust accounts pursuant to authorizations by the banks were 'advances' within the meaning of the statute." Krilich argues that this instruction amounted to summary judgment on the "application or advance" element of § 1014, violating the sixth amendment by depriving him of a jury trial on all elements of the offense. See *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *United States v. Ladish Malting Co.*, 135 F.3d 484, 490 (7th Cir.1998).

■■■ Krilich objected to this instruction but did not give a reason. Under Fed. R.Crim.P. 30 reasons are essential, so the prosecutor contends that our role is limited to a search for plain error. Fed.R.Crim.P. 52(b). Krilich responds that the reasons were "self-evident", making recitation otiose, and adds that the district judge must have been aware of *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), which demonstrates that issues such as these are for juries to decide. Yet it is exactly to avoid speculation about what judges must or should have known that Rule 30 calls for litigants to explain themselves. A citation to *Gaudin* could have led the district judge to withdraw the instruction and avoid this error. Rule 30 does not require elaborate or detailed argument, see *United States v. O'Neill*, 116 F.3d 245, 247 (7th Cir.1997), but counsel must say enough to inform the judge *why* the instruction is wrong, so that errors can be prevented. *United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir.1988).

■■■ An instruction that removes from the jury's purview questions that under *Gaudin* the sixth amendment commits to its decision is plain error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 1544, 1550, 137 L.Ed.2d 718 (1997), quoting from *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). This showing Krilich does not even attempt to make. He does not say that he denied at trial that the requisitions were "applications", or the disbursements "advances"; the evidence that they were is overwhelming, and no jury could have found otherwise, so Rule 52(b) precludes reversal on account of this error.

### V

■■■ The United States cross-appeals, contending that the district judge applied the Sentencing Guidelines improperly. Because the underlying conduct for the RICO conviction was bribery, the relevant guideline is § 2C1.1(b)(2)(A):

> If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000, increase by the corresponding number of levels from the table in § 2F1.1 (Fraud and Deceit).

After finding that Krilich's benefit was between $5 million and $10 million, the district court used the table at § 2F1.1(b)(1) to calcu-

late an increase of 14 offense levels but immediately departed downward 7 levels.

Application Note 7(b) to § 2F1.1 provides: "Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted." The judge concluded that a mechanical application of the table significantly overstates the seriousness of Krilich's conduct. According to the United States, the Guidelines do not permit a departure for this reason. Although § 2C1.1 refers to the *table* in § 2F1.1, it does not adopt the application notes to that table, the prosecutor insists.

Many guidelines incorporate the table in § 2F1.1, and this is not the first time we have had to decide whether judges may refer to the application notes that explain (or limit) the operation of that table. But the last time the subject came up, the parties' positions were reversed: the defendant argued that § 2F1.1's table should be applied without reference to its application notes, and the United States contended that reference to the notes was necessary, indeed obligatory. We held that the table is far from self-explanatory and that reference to its application notes is essential to its accurate application. *United States v. Kim Tae Sung*, 51 F.3d 92, 94–95 (7th Cir.1995). What's sauce for the goose is sauce for the gander. The district judge was entitled to accept the invitation extended by Application Note 7(b). See *Koon v. United States*, 518 U.S. 81, 94–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

█ Any departure, even one based on factors identified by the Sentencing Commission as appropriate, must be carefully considered and explained. We have considerable doubt that the district court's departure satisfies this requirement. Application Note 7(b) authorizes a downward departure if the table overstates the seriousness of the defendant's conduct. But the district judge did not directly address this issue; instead the judge believed that the Sentencing Commission should have made the sentence depend on the loss to third parties rather than the gain to the perpetrator, and it was the lack of a "loss" table that led him to cut in half the number of levels produced by the "gain"

table. According to the judge, Krilich's scheme produced a profit for him without an offsetting loss to anyone else, which justified a reduced sentence. Add the gain to the loss and divide by two to get the right result, the judge reasoned.

There is much to be said, as a matter of first principles, for using loss rather than gain as the starting point in determining sanctions. See Richard A. Posner, *Economic Analysis of Law* § 7.2 (5th ed.1998); Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J. Pol. Econ. 169 (1968). Sometimes the Guidelines follow this approach. The table in § 2F1.1 *is* a loss table, designed for fraud cases (so the touchstone is the victim's loss rather than the offender's gain). But other guidelines, of which § 2C1.1 is an example, use additional benchmarks; § 2C1.1 requires the judge to use the *greatest* of payment, loss, or benefit, according to the monetary categories in the § 2F1.1 table. Because departure is proper only when a case presents a circumstance "of a kind or to a degree not adequately considered by the Sentencing Commission", 18 U.S.C. § 3553(b), a district court's disagreement with the Commission's resolution of an issue it considered is never an appropriate ground for departure. *Koon*, 518 U.S. at 106, 116 S.Ct. 2035.

The district judge's approach is questionable in implementation in addition to being incompatible with the Guidelines. Because the Commission's tables are log-linear (and thus diminish the effect of large numbers), the approach of adding gain to loss and dividing by two should have been applied to the dollar figures, not to the offense level. Suppose the gain was $9 million and the loss zero. The average would be $4.5 million, which under the table in § 2F1.1 would produce a 13–level increase (only one fewer than the 14–level increase appropriate for the $5 million to $10 million range). Cutting the number of *levels* in half, to seven, gave Krilich the same sentence that would have been meted out to an offender whose gain (or loss caused) was between $120,000 and $200,000. The district judge never explained why Krilich is no more culpable than a person whose crime produces a gain or loss in that range.

What is more, we doubt the premise that Krilich committed a victimless crime. The district judge emphasized that Krilich did not obtain money from the municipalities but simply capitalized on their ability to facilitate investments whose return would not be taxed to the bondholders. That may be so, but the United States Treasury lost approximately a dollar in tax revenue for every dollar Krilich saved. The benefit to Krilich was a reduction in the rate of interest he had to pay to borrow the money for his projects. If interest on the bonds had been taxable, he would have had to pay more to make the investors indifferent between purchasing the taxable instruments and investing in tax-free instruments of equivalent risk, such as municipal bonds. The correspondence between Krilich's gain and loss to the public fisc is not exact, because some investors (pension trusts, for example) do not pay immediate taxes on any of their investments—though their beneficiaries will pay taxes when they receive their pensions. Calculating the actual loss in tax revenues from providing investors with a tax shield that the law does not allow is quite complex, and we do not suggest that a district court is required to undertake the calculation, but the existence of a substantial tax loss is undeniable. The difficulty of determining loss in bribery cases is one reason why the Commission could sensibly decide to focus on perpetrators' gains, which often can be ascertained more readily.

■ So although a departure might be justified under Application Note 7(b), the district court's reasoning is inadequate to support a seven-level departure. Before deciding on remand whether the table in § 2F1.1 "significantly ... overstates the seriousness of the defendant's conduct", the district court must recalculate Krilich's gain. Having decided to take a meat axe to the table in § 2F1.1—indeed, having announced even before hearing evidence about Krilich's gain that he would do this—the judge saw little reason to decide whether the gain exceeded $10 million, as the prosecution contended. Such a finding would add one extra level, but the judge was determined to allow no more than seven from the table, and whether the calculation was $14 - 7 = 7$ or $15 - 8 = 7$ did not matter. Because the starting point does matter, it must be ascertained with more confidence than the judge expressed in his pronouncement that the $5 million to $10 million range was as good a starting point as any.

■ On remand the judge should give no weight to the second factor that influenced the departure: the disparity between Krilich's presumptive sentence under § 2F1.1 and Mayor Sarallo's actual sentence, and between Krilich's sentence and those sentences handed out in the Operation Greylord prosecutions of judicial corruption during the 1980s. Consideration of variance among the sentences of different offenders is permissible only when the disparity is "unjustified". *United States v. Meza*, 127 F.3d 545, 549–50 (7th Cir.1997). Differences that occur as a result of a proper application of the Guidelines in light of the prosecutor's charging decisions are never "unjustified" as *Meza* defines that term. Krilich has not argued that the Guidelines were incorrectly applied in either his or Sarallo's case. In exchange for Sarallo's cooperation, the prosecutor refrained from charging his most serious offenses. That decision greatly reduced Sarallo's sentence but should not redound to the benefit of the uncooperative Krilich. As for the difference between Krilich's sentence and the penalties imposed more than 10 years ago on state judges who received bribes: if pre-Guidelines sentences under a regime allowing great judicial discretion (and thus great disparity) were allowed to influence the current sentencing mechanism, the Guidelines would be defeated. Sentences today depend on the Guidelines, not on how pre-Guideline cases were handled. *United States v. Fonner*, 920 F.2d 1330, 1335 (7th Cir.1990).

The convictions are affirmed. The judgment is vacated, and the case is remanded for resentencing.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I agree with the opinion of Chief Judge Politz in *United States v. Devoll*, 39 F.3d 575, 579 (5th Cir.1994), that 18 U.S.C. § 1014 applies only to lending activities by the finan-

cial institutions protected by the statute. Contrary to the implication in the majority opinion, *Devoll* does not stand alone and in opposition to the positions of several other circuits. Notably, each of the cases that has applied the statute has dealt with a situation involving the protected bank's function of extending credit. *See United States v. Yung Soo Yoo*, 833 F.2d 488, 489 (3d Cir.1987) (defendant convicted of "making false statements to a federally insured bank in order to influence its action on a commitment"); *United States v. Bonnette*, 781 F.2d 357, 359 (4th Cir.1986) (crediting defendant's account on basis of "sight draft" with auto title attached); *United States v. Tucker*, 773 F.2d 136, 139 (7th Cir.1985) (whether a letter of credit is within the scope of the statute); *cf. United States v. Erskine*, 588 F.2d 721, 722 (9th Cir.1978) (holding that the "elements of a section 1014 violation include these requisite mental states: knowledge of falsity, and the intent to influence action by the financial institution concerning a loan or one of the other transactions listed in the statute"). All of these cases are in harmony with the Supreme Court's explicit determination that the statute was designed to provide "penalties for making false statements or reports in connection with loans or other similar transactions." *Williams v. United States*, 458 U.S. 279, 289–90, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (quoting H.R.Rep. No. 91–1556 at 35 (1970), U.S. Code Cong. & Admin. News at 5582).

The funds held by the bank in this case involved no extension of credit. Therefore, the statute is inapplicable, and the convictions based on this section ought to be reversed.

In all other respects, I join the judgment and opinion of the court.