In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 21-3248

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BYRON PIERSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cr-00155-JMS-DML-1 — **Jane Magnus-Stinson**, *Judge*.

_____

ARGUED SEPTEMBER 8, 2023 — DECIDED JANUARY 4, 2024

_____

Before SYKES, *Chief Judge*, and ROVNER and KIRSCH, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury found Byron Pierson guilty of one count of unlawful possession of a firearm by a felon. 18 U.S.C. § 922(g)(1). He appeals from the judgment, contending that the district court erred: (1) by failing to hold a hearing to determine whether he had knowingly and voluntarily waived certain rights when he entered into a proffer agreement with the government; and (2) by allowing a witness to testify about

the course of the investigation that led to his arrest. Because we find no abuse of discretion in the district court's decisions, we affirm.

**I.**

On April 15, 2018, Indianapolis Police Officer Matthew Minnis responded to a 911 call at the home of a woman identified in the record only as "D.C." D.C. reported to Minnis that Byron Pierson, the appellant here, had threatened to "come back and shoot the house up" at 10 p.m. that evening. She told Minnis the make and model of the car that Pierson was driving and described the car's distinctive wheel rims. Minnis characterized D.C.'s demeanor as "very frightened." In the course of his investigation, Minnis learned that Pierson could be armed and that he had a criminal record. Minnis also obtained a description and photographs of Pierson. As a result of this investigation, Minnis decided to return to D.C.'s home that evening with additional officers in case Pierson returned to carry out his threat. Minnis arrived at the home at 9:15 p.m., and soon saw the car that D.C. had described. After he briefly lost sight of the car, other officers located it and initiated a traffic stop. Minnis proceeded to the scene of the stop.

A woman was driving the car, a child (Pierson's daughter) was in the front passenger seat, and Pierson was in the back seat. Pierson told the officers his name, and Minnis, who recognized him from photos that he obtained in his investigation, asked him to step out of the car. Pierson did not immediately comply but instead inquired why he was being asked to step out of the car. Minnis told him that he would explain once Pierson was out of the car, and again asked him to exit the car. Minnis noticed that Pierson appeared hesitant and nervous, and his hands were shaking. When Pierson stepped

out of the car, he pressed his right hip out and stated that he had a knife on his person. Another officer removed the knife. When Minnis then attempted to place Pierson in handcuffs, Pierson struck Minnis and fled on foot. The officers pursued him into a nearby yard. When Pierson was blocked from further escape by dense brush and trees, he looked back at the officers and reached toward his waistband. Minnis believed that Pierson was about to pull a firearm from his waistband. The officers then deployed a taser and attempted to restrain Pierson, who had fallen to the ground. During the struggle, one of the officers saw a firearm under Pierson's body and shouted "gun" several times to alert the other officers. Minnis was able to reach underneath Pierson and remove the gun. Pierson was then taken into custody.

Pierson was charged with one count of unlawful possession of a firearm by a felon. He initially entered into plea negotiations with the government, signing a Proffer Letter that waived certain rights that we will describe below. After two proffer sessions where he admitted possession of the firearm, and after reaching a tentative agreement to plead guilty, Pierson withdrew his plea and decided to go to trial. Prior to the trial, he moved *in limine* to exclude statements that he made during plea negotiations. He asserted that admission of the proffer statements would violate his rights to due process, to effective assistance of counsel, and to a fair trial.[1] He also argued that he had not knowingly and voluntarily waived his rights, and that he had not understood that the Proffer Letter

---

[1] The district court later found that the claims regarding his rights to effective assistance of counsel and a fair trial were conclusory, undeveloped, and unsupported, and therefore waived. R. 184, at 4 n.3. Pierson does not challenge that finding on appeal.

covered the second session in which he made the critical admission about possessing the gun. The government responded with legal support for the enforceability of the proffer agreement and indicated that it did not intend to offer any of Pierson's proffer statements as evidence in the absence of a triggering event as outlined in the Proffer Letter.

The court ordered an evidentiary hearing to determine whether Pierson had been told that the terms of the Proffer Letter applied to the second proffer session. R. 165. The court specifically limited the scope of the evidence to the issue of whether Pierson was advised before or during the second proffer meeting that the Proffer Letter applied to that meeting. The court also specified that if the government decided that it would not seek to introduce evidence of statements that Pierson made during that second session upon a "triggering event," it should inform the court so that the hearing could be canceled.

Pierson then moved to expand the scope of the evidentiary hearing, asserting, among other things, that the government's reading of the Proffer Letter was so broad that it cast doubt on the validity of the agreement. Specifically, Pierson claimed that there had been no "meeting of the minds" necessary to form a contract. He contended that the act of pleading "not guilty" could violate the terms of the Proffer Letter and that a hearing was required to determine the validity of the waivers in the agreement. The government then submitted a signed copy of the Proffer Letter, an affidavit from Jeffrey Baldwin (Pierson's former lawyer who had represented him during the proffer process), and email correspondence between government counsel and Baldwin indicating the parties'

understanding that the Proffer Letter covered the second proffer session.

The court then vacated the hearing and denied Pierson's motion *in limine* as well as his motion to expand the scope of the hearing. The court noted that Pierson had signed the Proffer Letter and had failed to identify any evidentiary basis for his assertion that he had not entered into the agreement knowingly and voluntarily. Nor had Pierson offered any factual basis for his claim that he did not know the Proffer Letter would apply to the second session. Because the Proffer Letter mentioned the possibility of multiple sessions and because Baldwin confirmed that he had informed Pierson prior to the second session that the Proffer Letter still applied, the court found that Pierson's proffer waiver was valid and applied to both sessions. The court nevertheless required the government to inform the court outside the presence of the jury if it believed that a triggering event had occurred that would allow the introduction of proffer statements.

The government also filed a motion *in limine*, seeking to admit evidence regarding the course of the investigation, including testimony regarding D.C.'s statements to the police. Pierson opposed this motion, and the court ruled that the government could not offer evidence that Pierson came to D.C.'s home, damaged her vehicle or threatened her. The court allowed the government to elicit the following testimony from the officers who conducted the traffic stop and the officers who later arrived at the scene: "They were conducting an investigation related to Mr. Pierson; had a description of the vehicle he was traveling in; were aware he had a criminal record; and had been told that he may be armed." R. 183, at 5. The court noted that this ruling was provisional and subject

to change under certain conditions. Specifically, if Pierson argued "whether through attorney argument or questioning of witnesses—that the responding officers' actions of questioning Mr. Pierson, getting him out of the car, chasing him and using Tasers on him were improper or disproportionate to the circumstances, the government may seek leave of Court outside the presence of the jury to offer additional evidence regarding Complainant's report to the police to establish in more detail what the responding officers knew at the time of their interaction with Mr. Pierson." R. 183, at 6.

During opening statements, government counsel stated in relevant part:

> You are going to hear a lot about this traffic stop during the course of this trial over the next day or so, and you will hear that this was not an entirely random traffic stop. Police officers here in Indianapolis were looking for Mr. Pierson specifically. They were conducting an investigation. They knew what the defendant looked like, they knew the particular type of car that he was likely to be in, they knew that the defendant had a criminal history, and they also had information that he was **likely** to be armed. And as a convicted felon, the defendant was not allowed to have that gun, and the police knew that when they were looking for him.

R. 271, at 12–13 (emphasis added).

At the end of the government's opening statement, defense counsel objected to the government's use of the word "likely" in reference to Pierson being armed, because the

court had ruled that the government could say only that he "may" be armed. The court reserved ruling on the objection and defense counsel then gave an opening statement in which he said in relevant part:

> Go back to April 15, 2018. Byron Pierson is riding, he is riding in his own vehicle, a car he has got. He is in the back passenger's seat, his girlfriend, who stays with him, Necoles Adams, is driving. Necoles was close to Byron's daughter, Serenity, age 11, who was in the front seat. He was letting Serenity ride in the front seat. All of a sudden, they're lit up. Police, emergency sirens, light them up, pull him over. Byron is stunned. What is going on? He didn't know it, but there had been this complaint. This complaint was from an ex. Police say they pulled him over because of a complaint, which didn't say he would likely be armed from the incident, it said he may be armed. They pulled him over, and they gave two other reasons for stopping him. They said the car was traveling 35, 38, 43, 37. The speed limit was 35, so they said 8 miles, ladies and gentlemen, 8 miles over the speed limit. They said, too, that the license plate, you couldn't see the month of expiration. We will show you a picture. You could see the month of expiration. They go in the car, they look. Mr. Pierson is in the back seat. They start saying get out of the car. What is going on? You need to get out of the car. Serenity is getting upset, Pierson is getting upset. What is going on here?

> Finally, they will deny it, but what happened is
> they pull him out of the car, and at this point
> Byron Pierson is afraid, very afraid, and his
> daughter Serenity is afraid—and maybe most of
> us can't relate to this, but maybe some people
> can—he is afraid for his safety. He panics, he be-
> gins to run a very short distance. They pursue.
> They Tase him. We are not alleging excessive
> force, but they Tase him. He goes to the ground.
> They Tase him again. He goes to the ground. He
> is still on the ground. They take his arm, they
> put his arm above his shoulders. He is still on
> the ground. At some point he is Tased a third
> time, and in the course of this at some point they
> claim, well, there is a gun.
>
> … The evidence will show when they pulled
> him out of the car, they didn't see a gun. When
> he turned they didn't say they saw a gun. When
> he ran they didn't say they saw a gun. When
> they Tased him they didn't see a gun. When he
> fell to the ground the first time they didn't see a
> gun.
>
> After the arrest, you know, they file reports with
> supervisors about the use of force, but they have
> the gun. So obviously this [is] 2018. This should
> be easy for us to resolve.

R. 271, at 16–18.

Following opening statements, the government asked the court to reconsider its ruling limiting the course-of-investiga-tion evidence, arguing that Pierson had opened the door to

this testimony by referencing a complaint that had been made by Pierson's ex-girlfriend. The government also asserted that Pierson had "borderline opened the door" on the use-of-force issue. The government asked the court to clarify how much background information it could introduce regarding the threat that Pierson had purportedly made to D.C. The court first addressed Pierson's objection and motion for a mistrial based on the government using the word "likely" rather than "may" in reference to whether Pierson was expected to be armed. The court admonished both government and defense counsel "to closely h[ew] to my orders *in limine* that are entered." R. 271, at 27. The court then denied the motion for a mistrial and indicated that it intended to give a limiting instruction to address the proper use of this evidence, in addition to the instructions the jurors had already been given informing them that opening statements are not evidence.

Turning to the government's motion to reconsider the court's ruling on the motion *in limine,* the court noted that it had sought under that ruling to balance the probative value of certain evidence against the risk of unfair prejudice under Federal Rule of Evidence 403. The court endeavored to avoid having the circumstances leading up to Pierson's arrest and the arrest itself become a central focus of the trial. But because of defense counsel's opening statement, the nature and circumstances of the arrest had become "front and center" in the case. Citing *United States v. Taylor*, 569 F.3d 742 (7th Cir. 2009), the court concluded that the course-of-investigation evidence was admissible as non-hearsay statements offered to prove their effect on the listener, and specifically to explain why the officers here took the steps they did when they pulled the car over and arrested Pierson. The court indicated that it intended to give a limiting instruction when the testimony came in, and

in fact did so at the appropriate moment in the trial, as we will discuss below. R. 271, at 33–38. The jury, as we noted, found Pierson guilty, and he appeals.

## II.

On appeal, Pierson asserts that the court abused its discretion in failing to hold a hearing to determine whether he knowingly and voluntarily waived his rights under the Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f) when he signed the Proffer Letter. He also contends that the court abused its discretion in allowing the government to submit the course-of-investigation evidence, including D.C.'s statements to officers regarding threats he purportedly made to her.

## A.

We review the district court's decision not to hold an evidentiary hearing for abuse of discretion. *United States v. Simpson*, 864 F.3d 830, 834 (7th Cir. 2017). We review the district court's factual findings, including whether the defendant knowingly and voluntarily entered into an agreement, for clear error. *United States v. Perillo*, 897 F.3d 878, 883 (7th Cir. 2018) (evaluating an appeal waiver in a plea agreement).

Statements made during plea negotiations are generally inadmissible under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f). Rule 11(f) specifies that, "The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Rule 410 in turn provides that, in a criminal case, evidence of a statement made during plea discussions with an attorney for the prosecuting authority is not admissible against the defendant who made the plea or participated

in the plea discussions if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea. Rule 410(a). But a defendant may waive the protections of those rules. *United States v. Mezzanatto*, 513 U.S. 196, 203–04 (1995). *See also United States v. Smith*, 770 F.3d 628, 639 (7th Cir. 2014) (the provisions of Rule 11 and Rule 410 are presumptively waivable, and a defendant may waive his right to prevent his statements from plea negotiations from being used against him); *United States v. Krilich*, 159 F.3d 1020, 1024 (7th Cir. 1998) (same). "[A]bsent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *Mezzanatto*, 513 U.S at 210. "A waiver is voluntary in the absence of coercion, … and is knowing if made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Krilich*, 159 F.3d at 1026 (internal quotation marks omitted). In this case, the Proffer Letter that Pierson signed allowed the government to use his proffer statements if certain "triggering events" occurred. For example, if Pierson testified "differently from any statement made or other information provided during the Proffer at any trial or other legal proceeding … the government may use any statement made or information provided by your Client … for cross-examination and impeachment purposes." R. 129-1, at 2. As we discuss below, the Proffer Letter also allowed the government to admit Pierson's proffer statements if he offered testimony, arguments, positions, or other evidence that differed from his proffer statements.

The district court did not abuse its discretion here. An evidentiary hearing is necessary only if there is a disputed factual issue that will affect the outcome of the motion. *See United*

*States v. Juarez*, 454 F.3d 717, 719–20 (7th Cir. 2006) (evaluating the need for an evidentiary hearing on a motion to suppress). A defendant seeking an evidentiary hearing must provide sufficient information to enable the court to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion. *Juarez*, 454 F.3d at 719–20 (citing *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998)). In this instance, Pierson provided the district court with nothing but conclusory statements that he did not sign the Proffer Letter knowingly and voluntarily. He did not contend that he was coerced, and he offered no support for a conclusion that he did not understand the rights that Rules 410 and 11(f) confer. *See Krilich*, 159 F.3d at 1026.

The government submitted to the court an executed copy of the Proffer Letter, signed by both Pierson and his attorney. Pierson signed the agreement under a line stating, "I understand the terms and conditions set out above, and I agree to make a Proffer under those terms and conditions." His lawyer similarly signed under the declaration, "I am Byron Pierson's attorney. I have explained to him/her the terms and conditions set out in this letter, and I am satisfied that he/she understands them and agrees to them." R. 129-1, at 3. Pierson's attorney repeated that representation in his affidavit and further confirmed that he had specifically discussed with Pierson the applicability of the Proffer Letter to the second proffer session prior to that session. In general, "signing a proffer letter waiving rights concerning the admissibility of a plea or statements made in conjunction with that plea is treated as a valid waiver of a defendant's rights not to have proffer statements used against him." *Smith*, 770 F.3d at 639.

In the face of that evidence and in the absence of anything to the contrary, the court did not abuse its discretion by denying an evidentiary hearing. Pierson's conclusory statement that he did not understand the consequences of signing the agreement is insufficient to justify the need for a hearing. He did not, for example, deny that his lawyer explained the agreement to him before he signed it; nor did he deny that his lawyer explained that the Proffer Letter applied to the second session. "A defendant's understanding of the *consequences* of his waiver need not be perfect; it was [the defendant's] understanding of the rights being relinquished, not of all possible repercussions of relinquishing them, that made his waiver knowing." *Krilich*, 159 F.3d at 1026. *See also Smith*, 770 F.3d at 639–40 (where the defendant failed to identify any evidentiary basis for the assertion that he unknowingly or involuntarily entered into a proffer agreement, waiver will be enforced). In short, Pierson failed to give the court sufficiently definite, specific information to discern what fact was in dispute that required a hearing. *Cf. United States v. Clark*, 935 F.3d 558, 568 (7th Cir. 2019) (the burden is on the defendant to support his motion to suppress); *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) (a defendant seeking a hearing on a motion to suppress must present definite, specific, detailed, and nonconjectural facts that justify relief before a district court will grant a suppression hearing; reliance on vague, conclusory allegations is insufficient). Without any affirmative indication that the proffer agreement was entered into unknowingly or involuntarily, an agreement to waive the protections of Rules 410 and 11(f) is valid and enforceable. *Mezzanatto*, 513 U.S. at 210; *Smith*, 770 F.3d at 639.

Moreover, we agree with the government that any error in refusing to hold a hearing (and again, we find no abuse of

discretion in the court's decision here) was harmless. The government never sought to introduce any statements from the proffer at Pierson's trial. Pierson asserts that he was nevertheless harmed because the threat of those statements being admitted was enough to completely change the nature of the defense strategy at trial. Pierson's proffer agreement contained a waiver clause specifying:

> If your Client offers testimony, arguments, positions, or otherwise presents evidence at any trial or other legal proceeding … different from any statement made or other information provided during the Proffer, the government may directly use any statements made or other information provided during the Proffer, as well as all evidence derived directly or indirectly therefrom.

R. 129-1. Although Pierson does not specify what defense he was prevented from mounting because of his fear that the proffer statements would come in under this provision, his argument implies that the unspecified defense would have conflicted with the facts he admitted at the proffer sessions.

But this is the way that proffer agreements are designed to work. By authorizing the prosecutor to use his statements if he contradicted himself at trial, Pierson made his representations more credible and strengthened his hand in plea negotiations. *Krilich*, 159 F.3d at 1024. When engaging in plea negotiations, a "prosecutor needs assurance that the defendant is being candid. A conditional waiver of the kind [Pierson] signed tends to keep the defendant honest, which makes the proffer device more useful to … both sides. For this strategy to work the conditional waiver must be enforceable; its effect

depends on making deceit *costly*." *Krilich*, 159 F.3d at 1025. As the Supreme Court noted in *Mezzanatto*, prosecutors require the "reliability assurance" that accompanies a waiver agreement, and a defendant seeking a favorable plea deal can maximize what he has to offer the prosecutor by conditionally waiving his rights under Rules 410 and 11(f). 513 U.S. at 208. Ultimately that means that a defendant who signs a proffer waiver and later withdraws from plea negotiations will not be able to mount a defense that factually contradicts his proffer statements. Pierson was still able to put the government to its burden of proof and robustly cross-examine the government's witnesses. That is the bargain he struck with the Proffer Letter.

**B.**

Pierson next contends that the district court erred in allowing the government to present evidence regarding D.C.'s statements to the police, and other background information about the course of the investigation. We review the court's decision to admit or exclude evidence for abuse of discretion. *United States v. Jarigese*, 999 F.3d 464, 470 (7th Cir. 2021). The court had initially declined to allow those statements to come in, finding that the probative value of this evidence was outweighed by the unfair prejudice that might result. Fed.R.Evid. 403. In reaching that decision, the court very carefully parsed the evidence that the government sought to admit and very narrowly allowed the government to make the representations that we outlined above. As we also noted, government counsel misspoke in opening statements and substituted the word "likely" for the word "may" in reference to the likelihood that Pierson would be armed. But defense counsel then raised the specter of D.C.'s statements by revealing to the jury

that the investigation involving Pierson was related to a specific complaint that an "ex" had made about him. Defense counsel also described at length how the actions of the officers making the traffic stop were aggressive, alarming to Pierson and his daughter, and unexpected. Although counsel expressly disclaimed a charge of excessive force, he strongly hinted that the discovery of the gun conveniently covered up for the level of force applied during the stop.

The court carefully considered the government's motion to reconsider the earlier ruling excluding evidence of D.C.'s statements to the police. The court found that defense counsel's opening statement had indeed opened the door to reconsideration. Because of defense counsel's statements, the "nature and circumstances of the arrest [had] become front and center in this case." R. 271, at 34. The court decided to allow the government to present additional evidence about the background of the investigation, including allowing Officer Minnis to testify regarding his conversation with D.C. and, specifically, Pierson's threat to come back and shoot the house up.

When the evidence came in, the court immediately instructed the jury on the proper and limited use of this evidence:

> So, folks, I'm going to give you an instruction of law right now. Of course, as you know, you are obligated to follow instructions of law. That is the testimony from Officer Minnis regarding the background information you just heard, that is the reason why he responded to that run, the information he received from the person who had made the call that day, that that information

> is being offered solely for the effect that it had
> on Officer Minnis. He doesn't know it if is true
> or not true. He was just acting based on what he
> was told. It is not being offered for the truth of
> the matter asserted. It's being offered for the
> limited purpose to explain the effect that it had
> on Officer Minnis. So I instruct you, you are not
> to consider his testimony regarding the back-
> ground information about the call and the com-
> plainant for its truth. And that ends my instruc-
> tion.

R. 273, at 59–60. We presume that the jury followed the court's instructions absent evidence of an overwhelming probability that the jury was unable to follow the instructions as given. *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007); *United States v. James*, 487 F.3d 518, 524 (7th Cir. 2007). There is no such concern here where the court gave a clear statement to the jury limiting how it could use the evidence.

True, we have expressed concerns about the use of such non-hearsay course-of-investigation testimony in the past. *United States v. Marchan*, 935 F.3d 540, 546 (7th Cir. 2019) (noting that we are reluctant to permit admitting evidence under the "course of the investigation" rationale for fear of its abuse or misuse); *Carter v. Douma*, 796 F.3d 726, 736 (7th Cir. 2015) (characterizing the course-of-investigation gambit as "so often abused and/or misunderstood that it is an evidentiary and constitutional minefield"). And in this case, the government may have "milked it a little bit" or "gilded the lily," as one panel member noted at oral argument, putting in more course-of-investigation evidence than was strictly necessary to clear up any issues created by defense counsel's opening

statements. In doing so, the government took the risk that we might find the jury unable to follow the limiting instruction as given. But we cannot say that the district court abused its discretion in this instance. The court allowed this testimony only after concluding that the defendant opened the door to it in opening statements, and the court also immediately gave a carefully crafted limiting instruction for the jury on the proper use of this evidence. *See United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011) (when a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence); *Serfling*, 504 F.3d at 677 (jurors are presumed to follow limiting instructions). Finally, the evidence of Pierson's guilt was quite strong: three officers—Minnis, Hubner, and Snow—testified to seeing the gun under Pierson after he fell to the ground. Officer Snow was on top of Minnis trying to secure him when he saw the gun and shouted a warning to his fellow officers. Minnis then pulled the firearm from under Pierson's body, and Hubner saw the gun in the grass after Pierson was secured. Two of those officers had seen a bulge in Pierson's waistband before he ran from the officers. The testimony on the gun was completely one-sided. If admitting the course-of-investigation evidence was an abuse of discretion (and again, we have concluded that it is not), its admission would be harmless error in the circumstances presented here. *United States v. Parker*, 11 F.4th 593, 596 (7th Cir. 2021) (an error is harmless where there is overwhelming evidence of guilt).

AFFIRMED.