COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Elder and Senior Judge Hodges
Argued at Richmond, Virginia


STEPHEN JAMES HOOD

                                                    MEMORANDUM OPINION* BY
v.        Record No. 2469-02-2                      JUDGE LARRY G. ELDER
                                                    FEBRUARY 17, 2004

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                            Margaret P. Spencer, Judge

            Horace F. Hunter for appellant.

            Paul C. Galanides, Assistant Attorney General (Jerry W. Kilgore,
            Attorney General, on brief), for appellee.


        Stephen James Hood (appellant) appeals from his bench trial conviction for first-degree

murder as a principal in the second degree.[1]  On appeal, he contends the trial court (1)

erroneously permitted the Commonwealth to introduce into evidence a statement he proffered to

the government in the course of plea negotiations; and (2) erroneously concluded the evidence

was sufficient to support his conviction as a principal in the second degree to first-degree

murder.  We hold the trial court's admission of appellant's proffer statements was not error and

that the evidence supported appellant's murder conviction.  Thus, we affirm.


───────────────

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] He also was convicted for misdemeanor abduction.  That conviction is not before us in
this appeal.  See infra footnote 2.

I.

BACKGROUND

In the early morning hours of August 31, 1990, an elderly woman named Eloise Cooper was abducted from the apartment she shared with her husband. On the afternoon of August 31, 1990, Mrs. Cooper was found dead in the woods of a nearby park.

An acquaintance of appellant's was convicted for Mrs. Cooper's murder. Later, however, appellant and a man named Billy Madison "[were] developed as [suspects]." In 2001, appellant and his attorney engaged in plea negotiations with the Commonwealth. Prior to doing so, appellant and the Commonwealth entered into an agreement promising appellant immunity from prosecution if he cooperated with the government and complied with various other terms contained in the agreement.

Pursuant to that agreement, appellant admitted he and Madison were acquaintances and that they engaged in several drug transactions with Roberto Steadman in the summer of 1990. Appellant said that on the night the victim was killed, Madison was searching for Steadman in order to retaliate against him for Steadman's taking their money without providing them with marijuana. Appellant admitted he was present when Madison abducted the victim at knifepoint and that he drove Madison and the victim to a secluded spot where Madison beat the victim and left her behind.

No plea agreement was reached, and appellant was scheduled to be tried for first-degree murder of the victim. The prosecutor confirmed that appellant's statements "can't be used in the Commonwealth's case in chief" but noted the agreement would not prevent any other use of the statements.

At trial, the prosecutor argued appellant presented evidence that breached the terms of the agreement and offered appellant's statements into evidence. The trial court admitted the statements and convicted appellant for first-degree murder.

II.

ANALYSIS

A.

ADMISSION OF STATEMENTS COMPRISING APPELLANT'S PROFFER

> [P]rosecutors may enter into cooperation/immunity
> agreements whereby the government promises an individual
> immunity from prosecution, or from use of, and/or derivative use
> of, statements the witness makes to the government. These
> agreements are usually made in consideration for the individual's
> cooperation in providing information concerning criminal activity.
> . . . Such agreements are contractual in nature and, thus, are
> subject to principles of contract law. . . . [C]ooperation/immunity
> agreements [also] are subject to due process safeguards which
> require that the government strictly adhere to the terms of its
> agreement.

Commonwealth v. Sluss, 14 Va. App. 601, 604, 419 S.E.2d 263, 265 (1992) (citations omitted).

The Commonwealth "[bears] the '"burden of establishing a breach by the defendant [of the

cooperation/immunity agreement] if the agreement is to be considered unenforceable."'" In fact, if

[appellant] did not breach the cooperation/immunity agreement, due process requires that the

government provide [him] with the benefit of his bargain." Id. at 606, 419 S.E.2d at 266

(quoting United States v. Johnson, 861 F.2d 510, 513 (8th Cir. 1988) (quoting United States v.

Brown, 801 F.2d 352, 355 (8th Cir. 1986))). Under the facts of this case, determining whether

appellant has breached the agreement requires us to examine the evidence introduced at trial and

to "construe the contract, which [we are] as well positioned to do as the trial court [was]." Id.

Here, the relevant portion of the cooperation/immunity agreement provided that if

appellant "at any time offers testimony or presents evidence different from any statement made

- 3 -

or other information provided during the proffer, the Commonwealth . . . may use any statements provided by [appellant], or any information[] derived directly or indirectly from these statements[,] for impeachment, cross-examination and rebuttal."  "Introduction of the statements thus was proper if either [appellant's] testimony or evidence that he presented through the testimony of others contradicted the proffer.  Because [appellant] did not testify, only the second clause is at issue. . . .  Evidence is evidence, whether it comes out on direct or cross-examination."  United States v. Krilich, 159 F.3d 1020, 1025 (7th Cir. 1998)  (citations omitted) (evaluating more broadly worded agreement, allowing introduction of proffer statements if accused "testif[ied] contrary to the substance of the proffer or otherwise presented a position inconsistent with the proffer," which the court interpreted to include not only evidence offered through witnesses other than the accused but also "a position [developed] through arguments of counsel").

An immunity/cooperation agreement such as this one strives to achieve dual goals-- giving the person making the statement "an incentive to tell the truth" while providing "assurance that [the accused can still] defend himself at trial if the bargaining collapse[s]."  Id.  Such an agreement does not require an accused to remain "passiv[e] at trial" or prevent him from offering any defense at all.  Id.  He remains "free to challenge the sufficiency of the [Commonwealth's] evidence; call into question the credibility of the [Commonwealth's] witnesses; question [Commonwealth's] witnesses about their knowledge and qualifications; challenge inconsistencies in the [Commonwealth's] evidence; and ask [Commonwealth's] witnesses about their motives for testifying against [him]," United States v. Rebbe, 314 F.2d 402, 408 (9th Cir. 2002), as long as the specific method he chooses to effect any such challenge is not "'contrary to' or 'inconsistent with' a defendant's admission of guilt in a bargaining proffer," Krilich, 159 F.3d at 1025.

In order to achieve the joint goals of an immunity/cooperation agreement, a "judge must find genuine inconsistency before allowing use of the [defendant's proffer] statements. . . . Statements are inconsistent only if the truth of one implies the falsity of the other." Id. at 1025-26. However, the inconsistency in testimony required for admission of a proffer statement need not be as directly contradictory as a defendant's saying in his proffer, "'X is true,'" and later offering evidence that "'X is not true.'" United States v. Jasin, 215 F. Supp. 552, 589 (E.D. Pa. 2002) (deciding whether proffer statement was "materially different" from evidence offered at trial, which phrase parties conceded was equivalent to phrase "inconsistent statement" in Fed. R. Evid. 613(b) and 801(d)(1)(A)). Testimony not directly contradictory may lead to inferences that "properly open[] the door to use of a proffer statement because the grounds or bases underlying the two assertions are inconsistent." Id. at 590 n.30 (citing Krilich, 159 F.3d at 1024-26).

The United States Court of Appeals for the Seventh Circuit applied these principles in Krilich, in which the defendant was accused of faking a hole-in-one during a golf tournament in order to bribe a local political leader. 159 F.3d at 1024. The defendant participated in plea negotiations, entering into an agreement that his proffer statements would be admissible if he "testif[ied] contrary to the substance of the proffer or otherwise present[ed] a position inconsistent with the proffer." Id. at 1024-25. During the proffer, the defendant admitted faking the hole-in-one. Id. at 1025. However, the defendant offered evidence, *inter alia*, that the hole at issue was "close to the clubhouse and easily observed." Id. at 1026. The court concluded the defendant "wanted the jury to infer that no one would attempt to fake a hole-in-one there," an implication it held was inconsistent with the proffer. Id. The Court held the trial court could reasonably have concluded this evidence "[went] well beyond casting doubt on the prosecutor's evidence" and "advance[d] a position inconsistent with the proffer," thereby justifying admission

of the defendant's statements made in the proffer.  Id.; see also Jasin, 215 F. Supp. at 591-92 (holding that where defendant was charged with illegal export activities, claimed he acted in good faith by relying on representations of another individual who claimed "'Washington approval'" for export activities, and testified, "'I believed [the individual's claim], why wouldn't I believe it?,'" government was entitled to admit proffer statements indicating defendant's knowledge of other fraud and wrongdoing by individual).

Here, appellant, in his proffer statements, said Madison sought to retaliate against Steadman for stealing from them during a drug deal.  Appellant admitted he was present when Madison, unable to locate Steadman, pushed the victim into the backseat of the car appellant was driving, climbed in on top of her as she cried and screamed for help, and subsequently murdered her when appellant found a secluded area in a nearby park.

At trial, appellant elicited testimony from Officer Steven Travis about his investigation of the abduction.  On cross-examination, the following exchange took place:

> Q  [During the] summer of 1990, were you familiar with something called the Golden Years Homicides?
>
> A  Yes, sir.
>
> Q  Now, during that time, specifically, August of 1990, weren't there four elderly African-American women who had been killed or stabbed during that time?
>
> A  Yes, sir, I believe they were.
>
> Q  And Ms. Cooper was one of those women, correct?
>
> A  I'm not sure if she was considered in that group, but --
>
> Q  And some of the women had been sexually --
>
> [PROSECUTOR]:  Judge, this is beyond the scope of my direct examination.  Now, for the purposes of saving time, I don't mind if [appellant's counsel] goes ahead and asks [Officer Travis] these questions, but I just want him to realize that he is calling Mr.

Travis now as his witness and he's asking these questions as his witness.

\* \* \* \* \* \* \*

[APPELLANT'S COUNSEL]: I don't have any more questions, Your Honor. He's not my witness.

Appellant's questioning ceased, and the witness did not respond to the partially articulated question regarding whether the victims had been sexually assaulted.

On the Commonwealth's direct examination of the medical examiner, Marcella Fierro, Dr. Fierro testified that the victim was found with her pajama top pulled up, her pajama pants removed, and her "legs spread eagle." The medical examiner said that, based on her "first impression," she "worked [the crime] up" as a sexual assault and examined the victim's body for trace evidence, "hairs or fibers or seminal fluid." Some of the wounds on the victim's body were consistent with attempted sexual assault or rape, but Dr. Fierro found no evidence of sperm in the oral, vaginal or anal swabs.

On cross-examination, appellant's counsel inquired further about the circumstances leading the medical examiner to suspect the attack may have involved a sexual assault. The medical examiner highlighted which of the victim's wounds were consistent with sexual assault. She then testified about a substance called amylase found on the victim's nipple, which she said was a "marker for saliva" and indicated that someone had been "sucking [the victim's] nipple." Finally, she found no tears at the opening of the vaginal area but noted traces of blood, insects and early decomposition. She "did not identify any absolutely convincing evidence . . . that there was vaginal penetration with injury." The following exchange then took place:

Q So just for arguments' sake, if someone had come in and confessed and said that they had vaginally penetrated her with a condom, would that be consistent with your findings?

A That could be okay.

- 7 -

\* \* \* \* \* \* \*

Q During the same time, weren't there several other murders of elderly African-American women?

A African-American and white ladies. Several elderly ladies, yes.

Q And they had been stabbed?

A Some had been stabbed and some had been beaten, and these ladies were found in their residences.

Q And some had been sexually assaulted.

A Yes, yes.

Q And this is all around the same time frame?

A I don't know. I didn't check the dates. I did not check the dates.

Thus, appellant elicited testimony from Officer Travis and Dr. Fierro that the murder of the victim was consistent in several respects with a string of contemporaneous sexual assaults and murders of elderly women in the area, referred to as the Golden Years Homicides. Although this testimony did not directly contradict appellant's proffer statements, two inferences flow from this testimony, and both inferences are inconsistent with appellant's proffer statements.

The first inference from the evidence appellant elicited from the medical examiner is that someone other than appellant and Madison murdered the victim. In fact, in objecting to the admission of the proffer statements, appellant's counsel argued, "for all we know, the same person could have committed all those crimes." Although true that someone else, i.e., the Golden Years murderer, could have killed the victim, evidence suggesting that someone else was the perpetrator contradicted appellant's proffer statement that Madison, aided by appellant, was the perpetrator.

The second inference to be drawn from the evidence appellant elicited from the medical examiner is that Madison was the Golden Years killer and that his killing of the victim was part of that string of sexual assaults. However, this inference was inconsistent with appellant's proffer statement that the motive for killing the victim was retaliation for Steadman's taking their drug money.

Thus, regardless of the interpretation given the testimony appellant elicited from Officer Travis and Dr. Fierro, their testimony challenged the Commonwealth's theory of the case in a way that was impermissible under the terms of the immunity/cooperation agreement. Appellant challenged the Commonwealth's theory of the case in a permissible way when he cross-examined the forensic scientist who testified the victim's stab wounds could have been inflicted by the type of chef's knives appellant had owned and obtained her concession that there existed thousands or even millions of knives of a type that could have been used to inflict the wounds found on the victim. In contrast, appellant challenged the Commonwealth's theory of the case in an impermissible way when he elicited testimony from Officer Travis and Dr. Fierro that was inconsistent with his proffer statements. The testimony was inconsistent because it "*implie[d] the falsity*," Krilich, 159 F.3d at 1025-26 (emphasis added), of either (a) appellant's statement that Madison killed the victim or (b) appellant's statement that the killing was in retaliation for Steadman's theft of their drug money. Thus, we hold the trial court did not err in ruling that, under the express terms of the cooperation/immunity agreement, appellant opened the door to allow into evidence the statements that comprised his proffer in order to rebut the evidence he elicited through Officer Travis and Dr. Fierro.

SUFFICIENCY OF EVIDENCE FOR FIRST-DEGREE MURDER CONVICTION[2]

Appellant argues the evidence was insufficient to prove he acted as a principal in the second degree to first-degree murder of the victim. We disagree.

On appeal, we view the evidence in the light most favorable to the Commonwealth. Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The judgment of a trial court will be disturbed only if plainly wrong or without evidence to support it. Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). The credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination. Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989). The fact finder is not required to believe all aspects of a witness' statements or testimony; it may accept some parts as believable and reject other parts as implausible. Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993).

> "A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance." Brown v. Commonwealth, 130 Va. 733, 736, 107 S.E. 809, 810 (1921). . . . The defendant's conduct must consist of "inciting, encouraging, advising or assisting in the murder." Frye v. Commonwealth, 231 Va. 370, 389, 345 S.E.2d 267, 280 (1986). It must be shown that the defendant procured, encouraged, countenanced, or approved commission of the crime. Augustine v. Commonwealth, 226 Va. 120, 124, 306 S.E.2d 886, 888-89 (1983). "To constitute one an aider and abettor, he must be guilty of some overt act, or he must

---

[2] Appellant argues on brief that the evidence was insufficient to support both the murder and abduction convictions. However, the murder conviction is the only one before us in this appeal. The trial court found appellant guilty of misdemeanor abduction and first-degree murder on April 4, 2002. It postponed sentencing on the murder conviction to allow preparation of a pre-sentence report. However, it sentenced appellant for the abduction on that date and informed him from the bench that, if he desired to appeal the abduction conviction, he had to file a notice of appeal within thirty days from that date. Neither the trial court's record for the abduction conviction nor a notice of appeal for that conviction appears in the record before us on appeal. Thus, we do not consider the abduction conviction in this appeal.

share the criminal intent of the principal." Triplett v. Commonwealth, 141 Va. 577, 586, 127 S.E. 486, 489 (1925) . . . .

Rollston v. Commonwealth, 11 Va. App. 535, 539, 399 S.E.2d 823, 825 (1991); see also Code § 18.2-18 (providing that in felony cases excepting most capital murders, principal in second degree may be indicted, tried, convicted and punished in all respects as if principal in first degree).

Here, the evidence, viewed in the light most favorable to the Commonwealth, proved appellant and Madison were "close friends" who jointly asked Roberto Steadman to purchase marijuana for them. When Steadman kept the money and failed to produce the drugs, appellant took Steadman's bicycle and hid it in his apartment. Appellant became angry when the apartment complex's maintenance man allowed Steadman to enter appellant's apartment and reclaim the bicycle. Appellant told the maintenance man that Steadman "owed [appellant] money on that bike."

Appellant and Madison subsequently telephoned Steadman and threatened him, saying, "We'll kick your butt, this and that and the other . . . ." At some point, Steadman saw appellant with a knife he kept in a sheath behind the seat of his truck. Appellant threatened Steadman with the knife and said, "[D]on't try to get away with our money."

Other evidence proved Steadman previously had told appellant and Madison that he lived with his grandmother. The address Steadman provided on his employment application for the Wood Run Apartments, where he worked with appellant and Madison, was the address where the elderly victim resided with her husband. Steadman, in fact, was not related to the victim and did not reside with her. He used her address so "no one [could] trace [him]."

On the night of the victim's murder, appellant and Madison left together. Appellant said he did not want to take his truck because it was too noisy, and Madison said he had access to a quieter vehicle. Appellant then suggested the men take a weapon and retrieved his knives from

- 11 -

his truck before he drove Madison downtown in a small red car. Appellant claimed the men were going to meet Steadman and admitted he "knew . . . one thing or the other was going to happen when they met with Steadman that night. Either Madison was going to get his money or his drugs, or he was going to 'fuck up' Steadman." With this knowledge, appellant drove Madison downtown, donned a baseball cap and remained slumped down in the car with the engine running while Madison went in search of Steadman. Appellant remained in that position even after Madison returned to the car to retrieve appellant's knives and sheath.

When Madison returned to the car with the elderly victim, who was wearing only her nightclothes and was screaming for help, appellant drove her and Madison to a dark secluded spot where he let his car coast to a stop so as to minimize the risk of detection. Appellant gave no indication to Madison that he did not wish to participate in the abduction; he helped Madison find a secluded spot; and he neither voiced an objection nor offered any aid to the victim when Madison dragged her from the car and began to beat and stab her. At some point during the course of the murder, appellant was close enough to the victim to allow her to scratch his right shoulder in a fashion severe enough that it remained visible the following evening. When asked by Madison's wife how he sustained the injury, appellant derogatorily and callously reported that "some nigger bitch [had] scratched him . . . the night before."

This evidence was sufficient to prove appellant acted as a lookout or guard for Madison, assisted in the abduction, and countenanced Madison's murder of the victim as retaliation against Steadman. Appellant drove Madison and the victim to a secluded area and allowed Madison to exit the vehicle with the victim. Appellant provided the murder weapon. Finally, appellant drove Madison home from the spot where the victim was later found dead. This evidence was sufficient to support appellant's conviction for first-degree murder as a principal in the second degree.

III.

For these reasons, we hold the trial court's admission of appellant's proffer statements was not error and that the evidence supported appellant's murder conviction.  Thus, we affirm.

<u>Affirmed.</u>

Benton, J., dissenting.

For the reasons that follow, I would hold that the prosecutor's proof of a sexual assault raised an issue beyond the scope of Stephen Hood's proffer statement and that Hood did not trigger the waiver under his agreement when he implied that Billy Madison, the person he named as the killer, may have been the perpetrator of this and other homicides.

I.

The grand jury indicted Hood for murder in the first degree and abduction. Six months later, Hood, his attorney, and an Assistant United States Attorney, who was acting as a Special Assistant Commonwealth's Attorney, entered into an agreement for a proffer from Hood "regarding the Commonwealth's investigation of certain individuals [with whom] Hood is familiar." Pertinent to the issue in this case, the agreement provides as follows:

> [I]n the event your client at any time offers testimony or presents evidence different from any statement made or other information provided during the proffer, the Commonwealth of Virginia may use any statements provided by your client, or any information, derived directly or indirectly from these statements for impeachment, cross-examination and rebuttal.[3]

The language in this portion of the proffer agreement is similar to the wording in other proffer agreements the government has used. See United States v. Krilich, 159 F.3d 1020, 1024 (7th Cir. 1998). This type of conditional waiver serves a distinct purpose when the parties are seeking a plea negotiation. "The prosecutor want[s] to give [the individual] an incentive to tell the truth; [the individual] want[s] assurance that he could defend himself at trial if bargaining collapsed (for otherwise he was delivering himself into the prosecutor's hands)." Id. at 1025.

---

[3] The record indicates that the prosecutor's witness testified about the details in the proffer statement as substantive evidence in the prosecutor's case-in-chief, contrary to the terms of the agreement. Hood's trial attorney, however, raised no objection concerning this breach. Therefore, this issue is not before us on appeal.

- 14 -

After signing the agreement, Hood gave "a detailed proffer to the Commonwealth" in furtherance of a plea negotiation. The record indicates, however, that when the trial judge ruled the Commonwealth's witness could testify concerning the proffer statement, the trial judge had not read it.[4] To understand the conundrum the trial judge faced, it is necessary to review in detail the relevant parts of Hood's proffer statement, which were made over the course of three interviews and are evidenced in seventeen typed pages.

In his first interview on November 6, 2001, Hood disclosed that he and Billy Madison were always looking for marijuana. At some point, Madison began purchasing marijuana from Roberto Steadman. Hood said Steadman was Madison's marijuana "connection" and was to sell Madison $100 worth of marijuana on August 31, 1990. Hood drove Madison to Cary Street where they met Steadman. After Steadman entered the car, Hood drove the car to a place near Steadman's apartment, where Steadman got out to get the drugs. In pertinent part, the statement continues as follows:

> Approximately five minutes after dropping off Steadman, Madison got out of the car and walked out of sight of Hood . . . . Madison returned approximately five minutes later. Madison was

---

[4] The trial judge may have had a general sense of the proffer because the prosecutor had filed a pretrial motion containing the following summary of Hood's proffer statement:

> On each occasion, Hood described in great detail how he and a friend . . . went to the Parkwood Avenue area of Richmond in the early morning hours of August 31, 1990, with the intention of purchasing narcotics. Hood described that he and his friend gave a putative drug seller money to obtain a quantity of drugs. Hood said that the drug dealer took the money but did not return. After a short while, Hood's companion became enraged, took Hood's knives and knife sheath -- Hood worked as a chef -- and left the car in search of the drug seller. Hood said that after another short interval, his companion returned to the car dragging an elderly female at knifepoint. The woman was placed in the car and Hood drove off. Hood said that he, his companion and the victim rode to a secluded area near Byrd Park, where the victim was removed from the car and killed.

- 15 -

mad and kept yelling "fuck it" over and over again. Though Hood tried to ask Madison what was going on, Madison did not respond. Instead, Madison reached down to the floorboard of the front passenger seat where he had been sitting and retrieved Hood's sheath and knives . . . .

After putting on the sheath, Madison walked toward the back of the vehicle. Hood saw Madison in the rearview mirror walking away from the car; however, he never saw into which apartment Madison went, nor had he seen into which apartment Steadman went. Hood does not recall seeing anyone else on the street that night.

After Madison had been gone for approximately five minutes, Hood heard a commotion near the car. The next thing he knew, Madison was throwing a black female, wearing a pastel nightgown, into the back seat of the car. Madison then got in on top of her. The lady was repeatedly screaming "help" and "please," and was crying. Madison kept telling the lady to "shut up."

When Madison threw the lady in the car, Hood tried to say "what the fuck," but before he could even get it out, Madison was saying "go." Madison kept switching between pointing the knife at the lady and pointing the knife at Hood. By the time he pulled away from the curb, Hood was crying.

Hood drove into Byrd Park . . . . While they were driving, Hood kept crying and saying "what the fuck" and Madison kept telling him to "shut up."

Hood finally turned onto a dark street and Madison told him to turn off the headlights. Hood turned off the lights, and rolled to a stop. Madison and the lady got out of the car and walked a short distance. It was dark and hard for Hood to see what was happening. It looked like Madison was hitting the lady. She was crying at first, but then stopped. Madison got back in the car and said "get the fuck out of here." Madison still had the knife in his hand, and was pointing it at Hood as he got back in the car. At that time, Hood did not know that Madison had killed the lady.

\* \* \* \* \* \* \*

After the incident, Hood was constantly trying to avoid Madison. One day, Madison approached Hood on the steps to Hood's apartment. Madison wanted Hood to testify as a character witness for him at a hearing in Charlottesville. Hood said no. Madison then threatened to tell law enforcement authorities about Hood's drug use. When Hood still resisted, Madison leaned in close and

said "I'll kill you just like I killed that nigger." . . . This was the first time Hood realized that Madison really killed the lady . . . .

> * * * * * * *

Hood never had any contact with Steadman after the murder. Hood never had any idea why Madison grabbed the lady that night. Hood never heard anything about Steadman living with his grandmother.

At the second interview on November 13, 2001, Hood said he first met Steadman a couple of weeks before the murder. After Madison introduced Hood to Steadman, Hood drove Madison and Steadman to Byrd Park. Steadman left the truck with their money and later returned with marijuana. Hood next met Steadman when Madison took him to Steadman's apartment, where they smoked marijuana. Hood also said that he and Madison knew Jeffrey Cox and occasionally smoked marijuana with him.[5]

The typed proffer from the third interview on December 3, 2001, states "[t]he chronology of events are now clearer in Hood's mind." Hood said "the day before or the day of the murder" Madison was angry with Steadman because he had given Steadman money the previous night to buy marijuana and Steadman had not brought the marijuana to him. Hood related again the following events as occurring the night of the murder:

> Hood was okay with Steadman, but Madison was "pissed off." That night Madison said he was going to "get his drugs or get this thing straight." Madison insisted that Hood go with him that night. The whole time they were driving down to meet Steadman, Madison kept saying he was going to get his dope or money. The murder happened after midnight. Madison gave Steadman more money that night.

---

[5] Hood's proffer statement does not implicate Cox in the events surrounding the murder. A pleading filed by Madison's attorney alleges, however, that "[i]n December 2001 the Commonwealth . . . released Jeffrey David Cox after wrongfully convicting him for the . . . murder and kidnapping" of this same elderly woman. The record also contains an order permitting the Commonwealth, under certain conditions, "to introduce evidence of facts and circumstances relevant to the conviction and release of Jeffrey Cox."

Hood knew the night of the murder that one thing or the other was going to happen when they met with Steadman that night. Either Madison was going to get his money or drugs, or he was going to "fuck up" Steadman.

Steadman was waiting on Cary Street that night. Madison had already arranged to meet with him. It seemed like Madison and Steadman had arranged a deal by the time Madison came over to Hood's apartment that night. Madison's eyes were bloodshot when he came over.

When Hood and Madison got back that night, . . . Madison gave Hood the sheath back at that time, without the knife he had used. Hood got out of the car, leaving the keys in the ignition. As Hood was running across the parking lot to his apartment, Madison yells "don't say anything about this." It was still dark when they got home that morning.

During this final interview, Hood again said he "did not know for sure that Madison had killed the lady till the stairwell incident," which is described in Hood's first interview.

## II.

In his opening statement at trial, the prosecutor said the body of the elderly woman was found "naked and spread eagle" with her nightclothes pulled over her head. Noting that the elderly woman died from three stab wounds, the prosecutor asserted that Hood, a chef, delivered to police several knives from a set of knives but omitted delivering one knife that would be shown to leave marks consistent with the wounds found on the elderly woman's body. Arguing that the evidence "put the [knife] with Stephen Hood," the prosecutor said the evidence would prove Hood's guilt of first-degree murder and also abduction. The prosecutor made no reference to Madison's role in the events.[6] The prosecutor's opening statement did not suggest that Hood

---

[6] The record indicates that, at a pretrial hearing, Madison's attorney unsuccessfully sought to quash a subpoena the prosecutor had issued for Madison to appear at Hood's trial. During that hearing, the prosecutor indicated that Madison "is a potential target and participated in the crime in which Mr. Hood is charged." The evidence at trial proved that Madison had not been arrested for any of the events surrounding the abduction and killing of the elderly woman. The evidence, however, did not disclose whether Madison had been indicted for any offense arising out of those events. The prosecutor did not use Madison as a witness.

was being viewed as a principal in either the first or the second degree and, thus, left open the option to prove the degree of Hood's culpability.

During the trial, the prosecutor raised the spectre of sexual assault in its case-in-chief even though none of the indictments charged a sexual offense. This issue was raised in the questioning of Dr. Marcella F. Fierro, the medical examiner. After she described the condition of the elderly woman's body, the prosecutor asked the following:

> Q: . . . [W]ith respect to when you saw her at the scene, I want to go back for one second with respect to that. You see the position that her body is in?
>
> A: Yes.
>
> Q: What, if anything, in your experience as a chief medical examiner, does that indicate?
>
> A: Well, when you see ladies with their clothes pulled up and their legs spread eagle and they're laying out in the woods, we treat this as a sex crime.
>
> Q: Did you look at or do any examination of her when you got her back to your office for signs of sexual assault?
>
> A: Yes, we examined her for the presence of trace evidence, which would be hairs or fibers or seminal fluid, and did a PERK kit, a Physical Evidence Recovery Kit, oral, anal and vaginal swabs and smears.
>
> Q: Okay. Did you recover anything, as far as that goes?
>
> A: Well, the laboratory tests that came back did not show any sperm on the vaginal, oral, or anal swabs. I wouldn't be surprised by anal swabs being negative, because they're often negative because of all the other bacteria in the anal canal. But the oral and vaginal swabs were negative for sperm.

The medical examiner also testified on direct examination that the elderly woman's thighs contained contusions "often seen with the forceful spreading of the legs." Although the prosecutor later advanced no argument that a sexual event had occurred, this evidence provided a basis upon which the trial judge might infer a sexual assault had occurred during the commission

- 19 -

of the murder.  See Code § 18.2-32 (providing that murder of the first degree includes a killing in

the commission of or attempt to commit rape or forcible sodomy).

Cross-examining Dr. Fierro, Hood's attorney asked the following questions:

> Q:  During the same time, weren't there several other murders of elderly African-American women?
>
> A:  African-American and white ladies.  Several elderly ladies, yes.
>
> Q:  And they had been stabbed?
>
> A:  Some had been stabbed and some had been beaten, and these ladies were found in their residences.
>
> Q:  And some had been sexually assaulted?
>
> A:  Yes, yes.
>
> Q:  And this is all around the same time frame?
>
> A:  I don't know.  I didn't check the dates.  I did not check the dates.

Later, during the direct examination of an F.B.I. agent, the prosecutor moved the judge to

permit the agent to testify concerning Hood's proffer statement.  The prosecutor argued that

Hood's attorney's questions to the medical examiner "about the Golden Years Murders . . . were

outside the scope of . . . direct examination . . . [and] contrary to the evidence that was given in

these proffers."[7]  Hood's attorney denied that the evidence caused a waiver under the agreement

and requested the trial judge "to take an *in camera* review of [the] statements that [Hood] may

have given on those three days and . . . say what specific in those three interviews that is contrary

---

[7] In a post-trial pleading, the prosecutors alleged the following:

> The Golden Years Murders . . . involved a different defendant (Leslie Leon Burchet), who killed elderly women in the Richmond area during the mid 1990's for different motives.  That defendant was convicted in the Richmond Circuit Court and is serving five (5) life terms for those crimes.

to anything . . . [the attorney] may have said." The trial judge declined to review Hood's proffer statements. Apparently relying upon the prosecutor's theory of prosecution, the judge ruled as follows:

> I can do that without looking at the statements. The statements in the interview by Mr. [Hood] were that he committed the murder. The testimony that came from Dr. Fierro was that it could have been related to the Golden Years Murders. So those are the statements that are inconsistent with the evidence that you presented.

### III.

When the prosecutor sought a ruling permitting testimony about Hood's proffer statement, the trial judge had to decide whether, in the language of the agreement, Hood had "present[ed] evidence different from any statement made or other information provided during the proffer." The governing principle is that the "judge must find *genuine* inconsistency before allowing use of the [defendant's proffered] statements." Krilich, 159 F.3d at 1025 (emphasis added). Indeed, this standard means that "[s]tatements are inconsistent only if the truth of one implies the falsity of the other." Id. at 1025-26. In other words, the test is whether Hood's evidentiary suggestion (that Madison was the murderer of the victim in this case and also was the perpetrator of the other unsolved murders) was a contradiction of his proffer statement. A review of the proffer statement (see Part I above) leaves no doubt that Hood denied committing the murder, that Hood said he "did not know[, when Madison returned to the car,] that Madison had killed the lady," and that Hood said he later learned "that Madison really killed the lady."

Although the trial judge was not required to believe Hood's self-serving proffer statements, the issue the trial judge had to resolve in ruling on the motion was not whether Hood was truthful when he made his proffer. But cf. Krilich, 159 F.3d at 1024 (noting that "[b]y authorizing the prosecutor to use his statements if he should contradict himself, [the defendant] made his representations more credible"). In ruling on the prosecutor's motion, the trial judge

- 21 -

had to assess the proffer statements only in the light of the limitation imposed by the proffer agreement. Simply put, the trial judge's task was not to determine whether Hood's proffer statement was true or false but, rather, her task was to evaluate for inconsistencies the evidentiary propositions Hood asserted at trial against the assertions contained in the proffered statement. Thus, for purposes of determining whether to admit the proffer statement, the trial judge could not accept as a true proposition the prosecutor's theory of prosecution and conclude that Hood was the killer.

The trial judge clearly misperceived the nature of Hood's proffered statements. In ruling that the questioning was contradictory of Hood's statement, the trial judge believed Hood had proffered that he committed the murder. He did not. Although the prosecutor's pretrial pleading indicated "the victim was removed from the car and killed," Hood's proffer statement represented that "Hood never had any idea why Madison grabbed the lady that night" and that Madison committed the murders. The prosecutors knew Hood had not confessed to being the killer; however, they did not correct the judge's misstatement when she ruled that Hood said "he committed the murder."

The Commonwealth's theory of prosecution at trial (that Hood was a principal in the first degree in the commission of the murder) created, in part, a dilemma for Hood. When the Commonwealth sought to prove that Hood was the person who actually abducted and actually killed the elderly woman, Hood was "free to challenge the sufficiency of the [Commonwealth's] evidence" in that regard "without triggering the proffer's admission." United States v. Rebbe, 314 F.3d 402, 408 (9th Cir. 2002). Hood clearly said in his proffer statement that he did not kill the elderly woman and consistently implied that Madison committed the murder. Hood said he did not know a murder had occurred until several days after the event. According to Hood's proffer statement, Madison's threat against Hood days after the murder strongly implied that

- 22 -

Madison had killed the elderly woman. Hood, therefore, was not barred from advancing the hypothesis at trial that Madison was the killer.

Likewise, when the prosecution presented evidence that would have permitted an inference at trial that the killer sexually assaulted the elderly woman, Hood was not required to passively accept the burden of that allegation. Nothing in Hood's proffer remotely suggested a sexual assault had occurred or that he had reason to know of a sexual assault. Although the record does not expressly disclose what strategy, if any, Hood's trial attorney was pursuing when raising the spectre of the "Golden Years" homicides, if, however, Hood's trial attorney was attempting to lay blame for those other murders onto Madison, and thereby suggest that Madison also committed the murder of the elderly woman in this case, nothing in that hypothesis is contrary to Hood's proffer statement. In view of the prosecutor's attempt to prove a fact Hood had not proffered, Hood may well have concluded that Madison, whom Hood alleged to be the killer, was a participant in other similar events. Hood's challenge to the prosecutor's hypothesis that Hood sexually assaulted and murdered the elderly woman did not conflict with his proffered statement and certainly was not inconsistent with his admission that he was the driver of the car when Madison abducted the elderly woman and killed her in the park.

I agree with the majority opinion's view that the questions posed by Hood's trial attorney permitted a possible inference that Madison was involved in one or more of the other murders that occurred in the city at that time. That evidentiary suggestion must be viewed, however, in light of Hood's proffer statement that he did not know why Madison abducted the elderly woman in this case and that he later learned Madison killed her. Additionally, the inference of sexual assault during the killing, which grew from the Commonwealth's evidence, was not consistent with any of Hood's proffered statements. Thus, Hood had a need to defend against the Commonwealth's effort to prove, contrary to Hood's proffer statement, that Hood, not Madison,

- 23 -

was the actual killer and that a sexual assault occurred.[8] Consistent with his agreement, however, Hood could not cast doubt upon proof that Madison was the killer because he said as much in his proffer statement. Hood also could not attempt to cast doubt upon his presence in the park when the murder occurred. Hood's agreement, however, did not bar him from presenting evidence that casts doubt on the prosecutor's attempt to show he was the actual killer.[9] In short, by attempting to suggest by his questioning of the medical examiner that Madison may have been the perpetrator of other murders and, by inference, also committed this

---

[8] The complexities of the evidentiary issues are further revealed by some of the pleadings. In one pleading, the Commonwealth disclosed that "it was learned that in 1998, . . . Madison told his wife that he and Stephen Hood committed the . . . murder and that Jeffrey Cox was innocent." In a motion *in limine*, however, the Commonwealth represents the following:

> On February 13, 1991, Jeffrey Cox was convicted . . . of the murder and abduction . . . and was sentenced to life plus 50 years in prison. The conviction of Cox was based, in large part, on his identification by [two witnesses, both of whom] have been subpoenaed by the Commonwealth in the above-styled case.
>
> The Commonwealth respectfully requests this Court to prohibit [Hood] from presenting evidence, or mentioning during opening statement or closing argument, the fact that Cox was convicted of the offense. The Commonwealth does not contest that [Hood] may affirmatively adduce, or elicit on cross-examination, evidence that Cox participated in the murder. For example, the Commonwealth concedes that [Hood] be allowed to attempt to elicit, if that be his strategy, the fact that [two witnesses] identified Cox as one of the perpetrators. The Commonwealth simply asks the Court to exclude evidence of Cox's conviction, as this is a conclusion drawn from facts presented to a jury in 1991.

The prosecutor knew, however, that Hood's proffer statement specifically recites that "Cox was definitely not involved in the commission of this crime . . . [and that the] car that Hood drove that night was definitely not Cox's car."

[9] Indeed, the trial judge ultimately accepted as credible the primary events described by Hood's proffer statement and rejected the prosecutor's assertion that Hood "is guilty of the abduction and he is guilty of the murder." The trial judge convicted Hood of accessory after the fact to the abduction and, because he "was not only the lookout but the driver of the getaway car," the judge convicted him "as a principal in the second degree" in the murder.

murder, Hood presented no evidence inconsistent with his proffered statement. Although the trial judge may have had some knowledge concerning the details of the "Golden Years" homicides, this record is silent as to the facts of those homicides and certainly contains no evidence that Madison was not involved in those events or was not suspected to be one of the perpetrators of those events. The prosecutor provided no evidentiary basis upon which the judge could find that the suggestion of Madison's involvement in the "Golden Years" homicides was in conflict with Hood's proffer statement.

I disagree with the majority opinion's view that Hood breached the agreement by suggesting a different motive for the killing. Significantly, the trial judge's ruling was not based upon a hypothesis of conflicting motives. The trial judge ruled that Hood said he committed the murder, that the medical examiner testified the murder could have been related to other murders, and that, therefore, Hood's "statements . . . are inconsistent with the evidence."

Furthermore, a review of Hood's proffered statement provides no motive for Madison's abduction and killing of the elderly woman. Indeed, Hood said that when Madison brought the woman to the car, he sought an explanation from Madison. Madison gave no explanation and told him to drive while threatening him. Hood's proffered statement recites that "Hood never had any idea why Madison grabbed the lady that night." Nothing in Hood's proffered statement contains an assertion or raises an implication that he knew the killing of the elderly woman was in retaliation for Steadman's theft of the drug money. Likewise, nothing in Hood's proffer statement asserts or implies that Madison sexually assaulted the elderly woman before killing her. Those matters flowed from the prosecutor's theory of the prosecution and were impermissibly considered by the trial judge in ruling that Hood's proffer statement, which she had not read, were in conflict with the questions posed by Hood's attorney.

For these reasons, I would reverse the conviction and remand for a new trial.